# TENISHA O'REGGIO *v.* COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES ET AL.
## (SC 20847)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

The plaintiff employee appealed from the judgment of the Appellate Court, which affirmed the trial court's judgment. The trial court had upheld the decision of the named defendant, the Commission on Human Rights and Opportunities, which determined that the defendant employer was not vicariously liable for the creation of a hostile work environment by another employee, K, in violation of the Connecticut Fair Employment Practices Act (§ 46a-51 et seq.). The plaintiff claimed that the Appellate Court incorrectly had applied the definition of the term "supervisor," adopted by the United States Supreme Court in *Vance* v. *Ball State University* (570 U.S. 421), in concluding that the employer could not be held vicariously liable because K, the individual to whom the plaintiff reported and who allegedly made racially discriminatory comments to the plaintiff and in her presence, was not a supervisor under the definition of that term adopted in *Vance*. *Held*:

The Appellate Court correctly applied to the plaintiff's hostile work environment claim the definition of the term "supervisor" adopted in *Vance*, which is limited to employees who are empowered by the employer to take tangible employment actions against the victim of the alleged discrimination.

Because there was no evidence in the record that K had the authority to take tangible employment actions against the plaintiff, the employer could not be held vicariously liable for K's creation of a hostile work environment.

(*Three justices dissenting in one opinion*)

Argued March 20—officially released August 1, 2024*

---

* August 1, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

O'Reggio *v.* Commission on Human Rights & Opportunities

*Procedural History*

Appeal from the decision of the human rights referee for the named defendant that the defendant Department of Labor was not liable to the plaintiff for her claim of a hostile work environment, brought to the Superior Court in the judicial district of New Britain and tried to the court, *Klau, J.*; judgment affirming the decision, from which the plaintiff appealed to the Appellate Court, *Prescott*, *Seeley* and *Eveleigh*, *Js.*, which affirmed the trial court's judgment, and the plaintiff, on the granting of certification, appealed to this court. *Affirmed.*

*James V. Sabatini*, for the appellant (plaintiff).

*Michael E. Roberts*, human rights attorney, for the appellee (named defendant).

*Colleen B. Valentine*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, *Joshua Perry*, solicitor general, and *Michael K. Skold*, deputy solicitor general, for the appellee (defendant Department of Labor).

*Opinion*

ALEXANDER, J. This certified appeal raises the question of who qualifies as a "supervisor" and renders an employer vicariously liable for the creation of a hostile work environment in violation of the Connecticut Fair Employment Practices Act (state act), General Statutes § 46a-51 et seq. The named defendant, the Commission on Human Rights and Opportunities (commission), concluded in an administrative decision that the defendant employer, the Department of Labor (department), was not vicariously liable for the creation of a hostile work environment in the office where it employed the plaintiff, Tenisha O'Reggio. The decision was upheld by the trial court, and the Appellate Court affirmed that judgment. See *O'Reggio* v. *Commission on Human Rights & Opportunities*, 219 Conn. App. 1, 4–5, 20, 293 A.3d 955

O'Reggio *v.* Commission on Human Rights & Opportunities

(2023). We granted the plaintiff's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that the legal standard adopted by the United States Supreme Court in *Vance* v. *Ball State University*, 570 U.S. 421, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013), applied to the plaintiff's claim under the [state act] . . . that the [department] was vicariously liable for the hostile work environment allegedly created by one of the [department's] employees?" *O'Reggio* v. *Commission on Human Rights & Opportunities*, 346 Conn. 1029, 295 A.3d 944 (2023). Following our well established use of federal case law applying Title VII of the Civil Rights Act of 1964, as amended by Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq. (Title VII), to guide our interpretation and application of the state act, we conclude that the Appellate Court's comprehensive and well reasoned opinion correctly adopted the *Vance* definition of the term "supervisor." Accordingly, we affirm the judgment of the Appellate Court.

The record reveals the following relevant facts and procedural history. The plaintiff began working for the department in 2009 and was promoted in 2012 to the position of adjudicator in the unemployment unit of its Bridgeport office, where she reported to the unit's program services coordinator, Diane Krevolin. Krevolin had the authority to assign work, to approve requests for leave, to set employee schedules, to provide training, and to conduct performance reviews. She did not have the authority to hire, fire, or otherwise discipline any employee. In 2016, the plaintiff, who is Black, filed an internal complaint with the department's office of human resources (HR), claiming that Krevolin, who is white, had made several racially discriminatory statements to her and in her presence.[1] The plaintiff met with

---

[1] The Appellate Court summarized Krevolin's discriminatory statements as follows: "[A]t a one-on-one meeting with Krevolin six months after the plaintiff began her adjudicator position, Krevolin asked the plaintiff what

O'Reggio *v.* Commission on Human Rights & Opportunities

HR personnel, and, the following day, the department placed Krevolin on paid administrative leave. HR personnel and the department's equal employment opportunity manager each conducted separate internal investigations into the plaintiff's claim. Both investigations concluded that Krevolin had made discriminatory statements. After considering the results of the investigations and Krevolin's lengthy record of service with the department, which lacked any previous disciplinary actions, the commissioner of labor issued Krevolin a one day suspension without pay and required her to attend diversity training.

After the internal investigations were completed, the plaintiff requested that she be allowed to report to someone other than Krevolin or to sit in an area away from Krevolin, but each of those requests were denied. The department determined that the plaintiff could not report directly to the person above Krevolin in the organizational structure, and Krevolin's union contract did not allow her to be involuntarily transferred for disciplinary purposes.[2] Because the plaintiff felt that she could not continue to report to Krevolin, she took a position in another division of the department. The new

she would do if someone called her a racial epithet; on a later date, Krevolin made a comment suggesting that the man with whom she was talking to must have been lying about looking for work because he was Black; at a meeting, Krevolin stated to the plaintiff and other adjudicators, '[y]ou know Hispanics don't have bank accounts'; Krevolin made a comment that the plaintiff believed was implying that the plaintiff had no reason to be in Sweden on vacation because she is Black; Krevolin said to the plaintiff's coworker, who had dreadlocks but then changed her hairstyle, 'I'm glad you . . . took that mess out of your head, you looked like Whoopi Goldberg'; and Krevolin complimented the plaintiff's hairstyle and stated that she did not like the plaintiff's old hairstyle because it reminded her of 'Aunt Jemima.' " *O'Reggio* v. *Commission on Human Rights & Opportunities*, supra, 219 Conn. App. 5–6 n.4.

[2] Within the organizational structure of the department, Krevolin reported to the director of adjudications and unemployment insurance field services, who, in turn, reported to the director of labor operations. The director of labor operations reported to both the commissioner and the deputy commissioner of labor.

O'Reggio *v.* Commission on Human Rights & Opportunities

position was for a durational basis from December, 2016, to December, 2017, after which time the plaintiff could request to return to her former position in the unemployment unit. Although Krevolin retired in October, 2017, the plaintiff did not seek to return to her former position when eligible in December, 2017. In March, 2019, the plaintiff asked to return to her former position, and the department granted that request.

While the department's internal investigations were ongoing, the plaintiff filed a complaint with the commission alleging that the department had subjected her to a hostile work environment based on her race and color in violation of General Statutes (Rev. to 2015) § 46a-60 (a) (1)[3] and General Statutes §§ 46a-58 (a)[4] and 46a-70.[5] Following a hearing, the presiding human rights referee

---

[3] General Statutes (Rev. to 2015) § 46a-60 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent . . . to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individuals' race [or] color . . . ."

[4] General Statutes § 46a-58 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of . . . color [or] race . . . ."

We note that § 46a-58 has been the subject of several amendments since the filing of the plaintiff's complaint. See Public Acts 2022, No. 22-82, § 11; Public Acts 2017, No. 17-127, § 2; Public Acts 2017, No. 17-111, § 1; Public Acts, Spec. Sess., June, 2015, No. 15-5, § 73. Because those amendments have no bearing on the merits of this appeal, and in the interest of simplicity, we refer to the current revision of the statute.

[5] General Statutes § 46a-70 (a) provides in relevant part: "State officials and supervisory personnel shall recruit, appoint, assign, train, evaluate and promote state personnel on the basis of merit and qualifications, without regard for race [or] color . . . ."

We note that § 46a-70 has been the subject of several amendments since the filing of the plaintiff's complaint. See Public Acts 2022, No. 22-82, § 16; Public Acts 2018, No. 18-72, § 44; Public Acts 2017, No. 17-127, § 8. Because those amendments have no bearing on the merits of this appeal, and in the interest of simplicity, we refer to the current revision of the statute.

O'Reggio *v.* Commission on Human Rights & Opportunities

(referee) issued a final decision, concluding that, although Krevolin had created a hostile work environment, the department acted promptly and reasonably under the circumstances to remedy the situation and, therefore, was not vicariously liable for Krevolin's actions.

The plaintiff thereafter filed an administrative appeal from the commission's decision to the trial court pursuant to General Statutes § 4-183. The trial court upheld the commission's decision, concluding that the plaintiff's vicarious liability claim under the state act against the department failed because Krevolin was not a "supervisor" as defined by the United States Supreme Court in *Vance*, namely, an employee empowered by the employer "to take tangible employment actions against the victim . . . ." *Vance* v. *Ball State University*, supra, 570 U.S. 424. The trial court further concluded that, despite some ambiguity in the commission's decision as to whether the referee had found Krevolin to be the plaintiff's supervisor under *Vance*, a remand to the commission was unnecessary because the plaintiff's counsel had expressly conceded during oral argument before the trial court that Krevolin's supervisory responsibilities, which did not include hiring, firing, or disciplining employees, did not satisfy the *Vance* standard.

The plaintiff appealed from the trial court's judgment to the Appellate Court. The sole issue in the appeal was whether the trial court had incorrectly applied the *Vance* definition of "supervisor" to the plaintiff's hostile work environment claim. See *O'Reggio* v. *Commission on Human Rights & Opportunities*, supra, 219 Conn. App. 10. The Appellate Court concluded that the *Vance* definition of "supervisor" furnishes "the appropriate definition for distinguishing between the coworker and supervisor theories of liability for hostile work environment claims brought under [the state act]." Id., 19. Accordingly, the Appellate Court affirmed the trial court's judgment. Id., 20. This certified appeal followed.

O'Reggio *v.* Commission on Human Rights & Opportunities

On appeal, the plaintiff, joined in part by the commission,[6] claims that the Appellate Court incorrectly applied the *Vance* definition of "supervisor" to her claim seeking to hold the department vicariously liable under the state act for the creation of a hostile work environment by Krevolin. The plaintiff contends that the *Vance* definition undermines the remedial nature of the state act because it is unduly narrow and that we should instead adopt a definition of "supervisor" that includes employees who have the authority to control the conditions under which subordinate employees do their daily work.

In response, the department argues that the Appellate Court correctly applied the *Vance* definition of "supervisor" because this court has "long followed federal Title VII precedent in determining an employer's liability when an employee is subject to a hostile work environment." See, e.g., *Brittell* v. *Dept. of Correction*, 247 Conn. 148, 166–67, 717 A.2d 1254 (1998) (applying definition of "hostile work environment" from federal case

---

[6] The commission contends that it is not necessary for this court to reach the certified issue of whether to adopt the *Vance* definition and, instead, asks us to affirm the trial court's judgment on the alternative grounds that (1) the plaintiff abandoned her claim before the trial court because of inadequate briefing, and (2) the department waived the *Ellerth/Faragher* defense that underlies the *Vance* issue. See, e.g., *Burlington Industries, Inc.* v. *Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." (Citation omitted.)); see also *Faragher* v. *Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (same). Given our conclusion that the *Vance* definition is applicable to claims filed under the state act, we need not reach the alternative grounds advanced by the commission.

350 Conn. 182 OCTOBER, 2024 189

O'Reggio *v.* Commission on Human Rights & Opportunities

law in case brought under state act). The department further argues that "powerful policy interests" support adopting the *Vance* definition of "supervisor." The department also argues that the definition urged by the plaintiff "requires murky factual determinations and risks inconsistent results." We agree with the department that, for the purposes of vicarious liability, a supervisor is an employee "empowered by the employer to take tangible employment actions against the victim"; *Vance* v. *Ball State University*, supra, 570 U.S. 424; including those individuals authorized to take such action subject to approval by higher management. See id., 437 n.8.

We begin with the principles that govern our standard of review in an appeal from the decision of an administrative agency. Under the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., "it is [not] the function . . . of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . Even for conclusions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . [Thus] [c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Internal quotation marks omitted.) *Drumm* v. *Freedom of Information Commission*, 348 Conn. 565, 579–80, 308 A.3d 993 (2024). "Cases that present pure questions of law, however, invoke a broader standard of review . . . . [T]he traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.)

O'Reggio *v.* Commission on Human Rights & Opportunities

Id., 580. Because this case presents a question of law that has not been previously considered, our review is plenary. See, e.g., *Longley* v. *State Employees Retirement Commission*, 284 Conn. 149, 166, 931 A.2d 890 (2007).

We turn next to the legal principles governing our construction and application of the state act. "This court previously has determined that Connecticut antidiscrimination statutes should be interpreted in accordance with federal antidiscrimination laws." (Internal quotation marks omitted.) *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 689, 41 A.3d 1013 (2012). "We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both." (Internal quotation marks omitted.) *Feliciano* v. *Autozone, Inc.*, 316 Conn. 65, 73, 111 A.3d 453 (2015). Thus, guided by the long line of cases following *Meritor Savings Bank, FSB* v. *Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986), in which the United States Supreme Court first recognized that the creation of a hostile or abusive work environment was a violation of Title VII; id., 66; this court has determined that, to establish a claim of hostile work environment under the state act, "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that [are] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive [work] environment . . . ."[7] (Emphasis omitted; inter-

---

[7] Guided by federal case law, this court has further determined that, in order to be actionable, a hostile work "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. . . . Whether an environment is objectively hostile is determined by looking at the record as a whole and at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . . [T]here must be more than a few isolated incidents of racial enmity . . . meaning that [i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments . . . . Thus, whether racial slurs constitute a hostile

O'Reggio *v.* Commission on Human Rights & Opportunities

nal quotation marks omitted.) *Patino* v. *Birken Mfg. Co.*, supra, 691.

"We also have recognized that our legislature's intent, in general, was to make [the state act] complement the provisions of Title VII." *Commission on Human Rights & Opportunities* v. *Echo Hose Ambulance*, 322 Conn. 154, 160, 140 A.3d 190 (2016). Accordingly, we previously have considered Title VII jurisprudence in interpreting the meaning of both "employer"; see, e.g., *Perodeau* v. *Hartford*, 259 Conn. 729, 738–39, 792 A.2d 752 (2002); and "employee" under the state act. See, e.g., *Commission on Human Rights & Opportunities* v. *Echo Hose Ambulance*, supra, 160–61. Because the term "supervisor" is not defined in the state act, and our appellate courts have not adopted a definition, we look to federal case law interpreting Title VII for guidance. See, e.g., *Haskenhoff* v. *Homeland Energy Solutions, LLC*, 897 N.W.2d 553, 571 n.2 (Iowa 2017).

In *Burlington Industries, Inc.* v. *Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998), and *Faragher* v. *Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), the United States Supreme Court adopted a framework setting forth the circumstances under which an employer may be held vicariously liable under Title VII for an employee's creation of a hostile work environment.[8] In establishing that

work environment typically depends [on] the quantity, frequency, and severity of those slurs . . . considered cumulatively in order to obtain a realistic view of the work environment . . . ." (Citations omitted; internal quotation marks omitted.) *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 699–700.

[8] As the Appellate Court aptly recognized, neither this court nor the Appellate Court previously has had the opportunity to consider whether the *Ellerth/Faragher* framework applies to cases brought under the state act. See *O'Reggio* v. *Commission on Human Rights & Opportunities*, supra, 219 Conn. App. 12–13; see also *Brittell* v. *Dept. of Correction*, supra, 247 Conn. 166 n.30 (recognizing then recent decisions in *Ellerth* and *Faragher* but deeming them inapplicable in case involving coworker sexual harassment). Nevertheless, no party in the present case argues that that framework should not apply. Therefore, like the Appellate Court, we assume, without deciding, that the *Ellerth/Faragher* framework applies to hostile work environment

O'Reggio *v.* Commission on Human Rights & Opportunities

framework, the court was guided by § 219 (2) (d) of the Restatement (Second) of Agency, recognizing an exception to the general rule that employers are not liable for those tortious acts that are committed outside the scope of employment; that exception allows for vicarious liability when the employee was "aided in accomplishing the tort by the existence of the agency relation." (Internal quotation marks omitted.) *Vance* v. *Ball State University*, supra, 570 U.S. 428, quoting 1 Restatement (Second), Agency § 219 (2) (d), p. 481 (1958); see *Faragher* v. *Boca Raton*, supra, 803 ("[w]hen a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw [on] his superior position over the people who report to him . . . whereas an employee generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a [coworker]"); *Burlington Industries, Inc.* v. *Ellerth*, supra, 761–62 ("When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted [in the absence of] the agency relation. A tangible employment action in most cases inflicts direct economic harm. As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury.").

Guided by this "aided-in-the-accomplishment theory of vicarious liability"; *Vance* v. *Ball State University*, supra, 570 U.S. 432; the United States Supreme Court concluded that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Industries, Inc.* v. *Ellerth*, supra, 524 U.S. 765. If a supervisor's harassment culminates in a tangi-

claims brought under the state act. See *O'Reggio* v. *Commission on Human Rights & Opportunities*, supra, 13.

O'Reggio *v.* Commission on Human Rights & Opportunities

ble employment action, such as termination, demotion, or an undesirable reassignment, liability for the supervisor's action is automatically imputed to the employer. Id., 762–63. "In that instance, it would be implausible to interpret agency principles to allow an employer to escape liability . . . ." Id., 763. "When no tangible employment action is taken, [however], a defending employer may raise an affirmative defense to liability . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." (Citation omitted.) *Faragher* v. *Boca Raton*, supra, 524 U.S. 807.

Conversely, if the harassing employee is a coworker and not a supervisor of the victim, the burden imposed by the affirmative defense does not apply, and the employer is liable only if the victim can show the employer was negligent in failing to prevent harassment from taking place. See *Vance* v. *Ball State University*, supra, 570 U.S. 448–49. "[Although] the reasonableness of an employer's response to . . . harassment is at issue under both standards, the plaintiff must clear a higher hurdle under the negligence standard [applicable to harassment by coworkers], where she bears the burden of establishing her employer's negligence, than under the vicarious liability standard [applicable to harassment by supervisors], where the burden shifts to the employer to prove its own reasonableness and the plaintiff's negligence." *Curry* v. *District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999), cert. denied, 530 U.S. 1215, 120 S. Ct. 2219, 147 L. Ed. 2d 251 (2000); see also *Swinton* v. *Potomac Corp.*, 270 F.3d 794, 804 (9th Cir. 2001) (Discussing burden shifting scheme and stating that "[i]t might reasonably be argued . . . that employ-

O'Reggio *v.* Commission on Human Rights & Opportunities

ers are 'better off' in the negligence context, [in which] the plaintiff is required to prove both the employer's knowledge of the harassment (or that it should have known) and that it failed to take reasonable corrective action. In the strict liability context, the plaintiff is required to prove significantly less in the prima facie case: merely that the harasser was his supervisor.''), cert. denied, 535 U.S. 1018, 122 S. Ct. 1609, 152 L. Ed. 2d 623 (2002).

Under the *Ellerth/Faragher* framework, it is, therefore, analytically important to determine whether an alleged harasser is a supervisor or a coworker. Because a split developed among the federal courts of appeals with respect to the meaning of the term "supervisor," the United States Supreme Court adopted a definition of that term in *Vance*. The court concluded in *Vance* that a supervisor is an employee empowered by the employer "to take tangible employment actions against the victim, i.e., to effect a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (Internal quotation marks omitted.) *Vance* v. *Ball State University*, supra, 570 U.S. 431. Additionally, if the coworker is empowered to take a tangible employment action subject to approval by higher management, that coworker might also qualify as a supervisor. Id., 437 n.8.

Adopting the *Vance* definition is consistent with our well established body of case law holding that "our legislature's intent, in general, was to make [the state act] complement the provisions of Title VII." *Commission on Human Rights & Opportunities* v. *Echo Hose Ambulance*, supra, 322 Conn. 160. Although this court has occasionally interpreted the state act differently from Title VII, "it has done so only in circumstances in which there is clear evidence of a contrary legislative intent." Id., 162; see, e.g., *McWeeny* v. *Hartford*, 287

O'Reggio *v.* Commission on Human Rights & Opportunities

Conn. 56, 69, 946 A.2d 862 (2008) (concluding that guidance from case law interpreting Title VII was unnecessary because relevant language of state act was "susceptible of only one reasonable interpretation"); see also *Vollemans* v. *Wallingford*, 103 Conn. App. 188, 217, 928 A.2d 586 (2007) (concluding that following guidance from federal case law would contradict intent of state legislature), aff'd, 289 Conn. 57, 956 A.2d 579 (2008). Neither the parties' briefs nor our independent research has found anything in the text or legislative history of the state act indicating that the legislature desired to depart from federal law with respect to the proof and defense of hostile work environment claims. See *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 695–97. We note that the dissent's rejection of the *Vance* definition is inconsistent with this court's approach in interpreting the state act "in accordance with federal antidiscrimination laws." (Internal quotation marks omitted.) Id., 689; see, e.g., *Feliciano* v. *Autozone, Inc.*, supra, 316 Conn. 73 ("[w]e look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both" (internal quotation marks omitted)).

In arguing for a broader approach, the dissent rejects the oft cited proposition that "our legislature's intent, in general, was to make [the state act] complement the provisions of Title VII." *Commission on Human Rights & Opportunities* v. *Echo Hose Ambulance*, supra, 322 Conn. 160. Specifically, the dissent argues that this proposition is the result of a misreading of *Pik-Kwik Stores, Inc.* v. *Commission on Human Rights & Opportunities*, 170 Conn. 327, 331, 365 A.2d 1210 (1976), by this court in *Wroblewski* v. *Lexington Gardens, Inc.*, 188 Conn. 44, 53, 448 A.2d 801 (1982). Although we recognize the dissent's criticisms of the analysis in *Wroblewski*, this proposition has been advanced in countless employment discrimination decisions and has put

O'Reggio *v.* Commission on Human Rights & Opportunities

the legislature on notice of our consistent interpretation of the state act. Given the interest in stability in the context of statutory interpretation, and the legislature's primary role in formulating the public policy of our state; see, e.g., *Graham* v. *Commissioner of Transportation*, 330 Conn. 400, 417–18, 195 A.3d 664 (2018) (discussing principles of legislative acquiescence and stare decisis); we decline to depart from guiding principles of federal law in the absence of an indication of legislative intent to the contrary. We acknowledge that there are good and persuasive arguments that support the dissent's adoption of a broader definition of who qualifies as a supervisor. The legislature, however, has not expressly set forth its intent for us to adopt such a definition. To the extent that the legislature wishes to define the term "supervisor" more broadly, it is of course free to adopt legislation directing that approach or, in the alternative, clarifying the persuasive value of federal case law as it has in other contexts.[9]

Given the lack of any response to *Vance* from our legislature, which is certainly aware of the hostile work environment theory of liability; see General Statutes § 46a-60 (b) (8) (harassment on "basis of sex or gender identity or expression," including via conduct creating "intimidating, hostile or offensive [work] environment," is prohibited discriminatory practice under state act); we continue to view consistency with federal case law as "especially important in employment law. Employers must comply with both state and federal law. Human resources personnel and supervisors must apply myriad rules and regulations in complex situations. . . . Uncertainty invites more litigation and increasing costs

---

[9] Compare Iowa Code Ann. § 216.18 (1) (West 2017) (directing that Iowa Civil Rights Act, Iowa Code Ann. § 216 et seq., which includes employment discrimination protections, "shall be construed broadly to effectuate its purposes"), with General Statutes § 35-44b (in interpreting state antitrust statutes, "the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes").

O'Reggio *v.* Commission on Human Rights & Opportunities

for all parties. An uncertain or costly litigation environment inhibits job creation.'' *Haskenhoff* v. *Homeland Energy Solutions, LLC*, supra, 897 N.W.2d 585.

The United States Supreme Court in *Vance* reasoned that the *Vance* definition of ''supervisor'' is ''easily workable'' and ''can be applied without undue difficulty at both the summary judgment stage and at trial.'' *Vance* v. *Ball State University*, supra, 570 U.S. 432. Indeed, whether an employee is a supervisor or simply a coworker can usually be ''readily determined'' by written documentation in official company records as opposed to ''a highly case-specific evaluation of numerous factors.'' Id.

The dissent, the plaintiff, and the commission nonetheless encourage us to reject the *Vance* definition, relying heavily on the argument advanced by Justice Ruth Bader Ginsburg in her dissenting opinion in *Vance*. Justice Ginsburg concluded that a definition that does not include employees who have the authority to direct daily work activities ''hinder[s] efforts to stamp out discrimination in the workplace'' by ''reliev[ing] scores of employers of responsibility for the behavior'' of their employees. *Vance* v. *Ball State University*, supra, 570 U.S. 463, 468 (Ginsburg, J., dissenting); see also *Aguas* v. *State*, 220 N.J. 494, 528, 107 A.3d 1250 (2015) (rejecting *Vance* definition and concluding that more expansive definition of ''supervisor'' ''prompts employers to focus attention not only on an elite group of [decision makers] at the pinnacle of the organization, but on all employees granted the authority to direct the day-to-day responsibilities of subordinates, and to ensure that those employees are carefully selected and thoroughly trained''). We disagree for two reasons. First, when a harasser is not a supervisor under *Vance*, an employer may nevertheless be held liable upon proof that it was negligent in failing to prevent that harassment. See *Vance* v. *Ball State University*, supra, 446. A plaintiff could therefore still prevail by showing, for example, that ''an employer

O'Reggio *v.* Commission on Human Rights & Opportunities

did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints . . . .'' Id., 449. Thus, an employer is not relieved of responsibility for the behavior of its employees when its own negligence has led to the creation or continuation of a hostile work environment. See id., 446. This is particularly so when an employee has put the employer on notice of the hostile work environment created by a coworker, rendering the employer's complaint process—and the employee's participation in that process—of paramount importance in any assessment of the employer's negligence.

Second, by encompassing within the definition of "supervisor" those employees empowered by the employer to take tangible employment actions subject to approval by higher management, the *Vance* definition shifts the burden of proof to the employer under the *Ellerth/ Faragher* framework whenever the harasser is aided by the agency relationship with the employer. Even if an employer confines ultimate decision-making power to a small number of individuals in an attempt to escape vicarious liability, those individuals will likely need to rely on—and perhaps delegate authority to—other individuals who actually interact with the subordinate employees. If a delegation of the authority to take tangible employment actions occurs, an employer could still be subject to vicariously liability. See id., 437 and n.8.

We acknowledge that coworkers are, unfortunately, more than capable of creating hostile work environments. We conclude nonetheless that " 'something more' is required in order to warrant vicarious liability," and that something more requires the harasser to have the power to take tangible employment actions. Id., 439. In the absence of a contrary expression of intent by the legislature with respect to the state act, the *Vance* definition strikes a reasonable balance between

O'Reggio *v.* Commission on Human Rights & Opportunities

accomplishing the antidiscrimination purpose of the state act and protecting the legitimate interests of employers. See id., 431–32. It would upset settled expectations with respect to our jurisprudence interpreting the state act for us to depart from the *Vance* definition of "supervisor."

In the present case, the commission made no factual findings as to whether Krevolin was a supervisor under the *Vance* definition. A remand to the commission, however, is unnecessary because the plaintiff's counsel expressly conceded that Krevolin's responsibilities did not satisfy the *Vance* definition of "supervisor,"[10] meaning that "the evidence supports only one conclusion as a matter of law . . . ." (Internal quotation marks omitted.) *O'Reggio* v. *Commission on Human Rights & Opportunities*, supra, 219 Conn. App. 19; see *Salmon* v. *Dept. of Public Health & Addiction Services*, 259 Conn. 288, 304–305, 788 A.2d 1199 (2002). Although Krevolin had the authority to assign work, to approve requests for leave, to set employee schedules, to provide training, and to conduct performance reviews, there is no evidence in the record that she had the authority to take tangible employment actions against the plaintiff. Accordingly, we conclude that the department is not vicariously liable for Krevolin's creation of a hostile work environment.

The judgment of the Appellate Court is affirmed.

In this opinion McDONALD, D'AURIA and DANNEHY, Js., concurred.

ROBINSON, C. J., with whom MULLINS and ECKER, Js., join, dissenting. I respectfully disagree with the

[10] At oral argument before this court, the plaintiff's counsel specifically stated: "Krevolin did not have the authority by her employer to terminate, promote, demote, transfer, or discipline, so she lacked the power to inflict direct economic harm on [the plaintiff]. Thus, per . . . the definition in *Vance*, [Krevolin] is not a supervisor."

majority's conclusion that the definition of the term "supervisor" adopted by the United States Supreme Court in *Vance* v. *Ball State University*, 570 U.S. 421, 424, 450, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013), for purposes of establishing vicarious liability under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq. (2018), is the correct standard to apply to hostile work environment claims brought under the Connecticut Fair Employment Practices Act (state act), General Statutes § 46a-51 et seq. Consistent with Connecticut's robust antidiscrimination scheme, I would adopt a broader definition of the term "supervisor" that motivates employers to foster work environments that are free from discrimination. Specifically, I would include within the definition of supervisor not only individuals vested with the authority to make or recommend tangible employment decisions, but also those authorized to direct the daily work activities of subordinate employees. Because I conclude that the *Vance* definition of supervisor is too narrow to apply to hostile work environment claims brought under the state act, like those of the plaintiff, Tenisha O'Reggio, I would reverse the judgment of the Appellate Court. See *O'Reggio* v. *Commission on Human Rights & Opportunities*, 219 Conn. App. 1, 19–20, 293 A.3d 955 (2023). Accordingly, I respectfully dissent.

At the outset, I agree with the majority's recitation of the statement of the facts, procedural history, and standard of review applicable to this certified appeal. I also agree with the majority's description of the *Ellerth/ Faragher* body of federal case law, setting forth the burden of proof in hostile work environment cases, under which a harasser's supervisor status is significant in determining whether an employer bears the burden of proof in the form of an affirmative defense. See *Burlington Industries, Inc.* v. *Ellerth*, 524 U.S. 742, 762–65, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Fara-*

350 Conn. 182 OCTOBER, 2024 201

O'Reggio *v.* Commission on Human Rights & Opportunities

*gher* v. *Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). Where I part company with the majority is its adoption of the *Vance* definition of the term "supervisor" for claims brought under the state act.

Although the majority agrees with the United States Supreme Court's description of the *Vance* definition as " 'easily workable' " and " 'appli[cable] without undue difficulty at both the summary judgment stage and at trial,' " Justice Ruth Bader Ginsburg's dissent in *Vance* astutely points out that the definition overlooks the fact that "[s]upervisors, like the workplaces they manage, come in all shapes and sizes." *Vance* v. *Ball State University*, supra, 570 U.S. 465 (Ginsburg, J., dissenting). "One cannot know whether an employer has vested supervisory authority in an employee, and whether harassment is aided by that authority, without looking to the particular working relationship between the harasser and the victim." Id. As one scholarly commentator has aptly observed, "[w]orkplaces . . . are becoming more fluid, with responsibilities shifting from one project to another. In these fluid environments, [i]t is not reasonable to expect that supervisor status can be accurately discerned solely from job descriptions or express grants of power from upper management."[1]

---

[1] "This is especially true in industries with [low wage] workers. An informal survey by the National Women's Law Center found that in ten [low income] industries, [lower level] supervisors without the authority to take tangible employment actions [nevertheless] had the authority to train new employees, assign tasks, give permission for breaks, set schedules, make teams, coach employees, and evaluate performance." J. Sheldon-Sherman, "The Effect of *Vance v. Ball State* in Title VII Litigation," 2021 U. Ill. L. Rev. 983, 1032. After the United States Supreme Court decided *Vance*, Congress attempted to restore through legislation the broader definition of supervisor embraced by the Equal Employment Opportunity Commission. See id., 1040–41 and n.359. Congress' proposed act recognized the reality for low wage workers: "Workers in industries including retail, restaurant, health care, housekeeping, and personal care, which may pay low wages and employ a large number of female workers, are particularly vulnerable to harassment by individuals who have the power to direct day-to-day work activities but lack the power to take tangible employment actions." (Internal quotation marks omitted.)

O'Reggio *v.* Commission on Human Rights & Opportunities

(Footnote omitted; internal quotation marks omitted.) J. Sheldon-Sherman, "The Effect of *Vance v. Ball State* in Title VII Litigation," 2021 U. Ill. L. Rev. 983, 1032; see also E. Lee, Note, "Simplicity v. Reality in the Workplace: Balancing the Aims of *Vance v. Ball State University* and the Fair Employment Protection Act," 67 Hastings L.J. 1769, 1787 (2016) ("[e]mployees across industries, especially [low wage] workers, find themselves 'between a rock and a hard place' when they experience harassment in the workplace—choosing between the risk of losing their job after reporting the harassment, and the risk of unsuccessfully litigating their claims under the narrow *Vance* standard"); Note, "Title VII—Employer Liability for Supervisor Harassment—*Vance v. Ball State University*," 127 Harv. L. Rev. 398, 405–407 (2013) (criticizing majority opinion in *Vance* for not considering superior-servant principle from agency law, which provides that, when "an employer's vicarious liability depends on the tortfeasor's 'superior' status, as defined in relation to the injured employee, that status does not depend on the tortfeasor's having the authority to hire or discharge the injured employee" (emphasis omitted; footnote omitted)).

Nonetheless, the majority adopts a narrow definition that allows employers to escape liability, even if the harasser had the authority to, for example, assign work, approve requests for leave, create the work schedule, provide training, and conduct performance reviews. Indeed, pursuant to the majority opinion, harassers with such control over their victims' working lives somehow are not aided in accomplishing the harassment by that very control. See *Faragher* v. *Boca Raton*, supra, 524

Id., 1032. "And it is precisely in these contexts—[in which] employees have limited options and harassers control significant daily work activities that affect economic and emotional well-being—that protection against workplace harassment should be paramount." Id., 1033.

O'Reggio *v.* Commission on Human Rights & Opportunities

U.S. 803 ("[w]hen a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw [on] his superior position over the people who report to him"). Because, in my view, the authority over a subordinate employee's day-to-day working conditions, and not solely the authority to take or recommend tangible employment actions, aids a harasser in the workplace, I agree with Justice Ginsburg's adoption of the more expansive definition of the term "supervisor" that had been promulgated by the United States Equal Employment Opportunities Commission (EEOC) prior to *Vance.* See U.S. Equal Employment Opportunity Commission, Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors (last modified March 29, 2010) p. 4, available at http://www.eeoc.gov/policy/docs/harassment.pdf (last visited July 30, 2024).

Guided by the realities of the twenty-first century workplace, I conclude that the definition of "supervisor" for purposes of an employer's vicarious liability for hostile work environment claims under the state act should include an individual who directs an employee's day-to-day working conditions, in addition to one who is authorized to take tangible employment actions. The prospect of filing a hostile work environment complaint against an individual with the authority to affect an employee's day-to-day life at work by, for example, changing schedules, rejecting time off requests, assigning extra work, or giving a poor performance review is likely just as intimidating to an employee as filing a complaint against an individual who can take a tangible employment action. Indeed, in many cases, employees have regular interaction only with a superior who can direct their daily work activities, and not with a superior who can fire them. By removing these individuals from the definition of "supervisor," employers throughout the state "will have a diminished incentive" to train the

O'Reggio *v.* Commission on Human Rights & Opportunities

individuals who "actually interact" with the employees. (Internal quotation marks omitted.) *Vance* v. *Ball State University*, supra, 570 U.S. 468 (Ginsburg, J., dissenting); see M. Chamallas, "Two Very Different Stories: Vicarious Liability Under Tort and Title VII Law," 75 Ohio St. L.J. 1315, 1329 (2014) (negligence standard "is largely oblivious to systemic problems," whereas "strict liability provides greater incentives for employers to think [system wide] and to address the culture of the organization").

I agree with the plaintiff's argument that the remedial purpose of the state act weighs against adopting *Vance*'s unrealistically narrow definition of the term "supervisor." Although both the state act and its legislative history are silent on the definition of "supervisor," which is itself a term that is a product of the case law interpreting Title VII, a broader definition of "supervisor" that includes individuals who have the authority to direct daily work activities better effectuates "the noble purpose" of the state act, namely, "to create an effective machinery in this state for the elimination of discrimination in employment." 8 H.R. Proc., Pt. 7, 1959 Sess., p. 2584, remarks of Representative Robert Satter. In restricting the definition of the term "supervisor," the United States Supreme Court "[shut] from sight the robust protection against workplace discrimination Congress intended Title VII to secure." (Internal quotation marks omitted.) *Vance* v. *Ball State University*, supra, 570 U.S. 463 (Ginsburg, J., dissenting). Adopting the limited *Vance* definition for purposes of the state act frustrates the intent of the legislature by limiting the robust protections against workplace discrimination that the legislature envisioned in enacting the state act.

My most significant disagreement with the majority comes from its apparent determination that, without clear legislative history indicating otherwise, Connecticut antidiscrimination statutes should *always* be inter-

preted in accordance with federal antidiscrimination laws.[2] Instead, I am persuaded that "federal law defines

[2] The majority relies on *Commission on Human Rights & Opportunities* v. *Echo Hose Ambulance*, 322 Conn. 154, 160, 140 A.3d 190 (2016), in which this court observed that it previously had "recognized that our legislature's intent, in general, was to make [the state act] complement the provisions of Title VII." This oft recited proposition, however, is based on a long line of cases that misinterprets the legislature's intent and compounds the error through sheer repetition. I note that the legislature first enacted the state act in 1947, seventeen years before Congress passed Title VII in 1964. See General Statutes (Supp. 1947) §§ 1360i through 1366i. Thus, there can be no legislative history from that time discussing an intention to make the state act complement a nonexistent federal law. The idea that the legislature's intent was to make the state act complement Title VII comes from an amendment to the state act in 1967. At that time, Title VII prohibited discrimination in employment based on sex, but the state act did not. Thus, the legislature passed a bill that purported to "[bring] the [state] act in line with Title [VII] . . . ." 12 S. Proc., Pt. 3, 1967 Sess., p. 1091, remarks of Senator Frederick Pope, Jr. Thereafter, this court, in *Pik-Kwik Stores, Inc.* v. *Commission on Human Rights & Opportunities*, 170 Conn. 327, 365 A.2d 1210 (1976) (*Pik-Kwik*), concluded that, "[a]lthough the language of the federal statute and that of the [state act] differ slightly, it is clear that the intent of the legislature in adopting 1967 Public Acts, No. 426 (which extended the provisions of the [state act] . . . to prohibit discrimination on the basis of sex) was to make the [state act] coextensive with the federal [statute] . . . ." (Citation omitted.) Id., 331. In 1982, however, that quote from *Pik-Kwik* was truncated in *Wroblewski* v. *Lexington Gardens, Inc.*, 188 Conn. 44, 53, 448 A.2d 801 (1982), in which this court observed that it had "previously confirmed our legislature's intention 'to make the [state act] coextensive with the federal [statute].' " In my view, by truncating the quote from *Pik-Kwik*, this court's decision in *Wroblewski*, and the very lengthy line of cases that follows, misinterprets *Pik-Kwik* and the legislature's intention with respect to the state act. The legislature's desire to add sex as a protected class to bring the state act in line with Title VII is emphatically not the same as the legislature's declaration of its intention that the state act always complement Title VII. Indeed, had the legislature desired this court to follow federal case law in interpreting the state act, it could have clearly expressed that intention, as it has done in other areas, such as in the Connecticut Antitrust Act, General Statutes § 35-24 et seq., which expressly provides that "[i]t is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes." General Statutes § 35-44b; see, e.g., *Tremont Public Advisors, LLC* v. *Connecticut Resources Recovery Authority*, 333 Conn. 672, 693, 217 A.3d 953 (2019) ("this court follow[s] federal precedent when [it] interpret[s] the [Connecticut Antitrust] [A]ct *unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently*" (emphasis in original; internal quotation marks omitted)). Thus, federal law

O'Reggio *v.* Commission on Human Rights & Opportunities

the beginning and not the end of our approach to the subject.'' (Internal quotation marks omitted.) *State* v. *Commission on Human Rights & Opportunities*, 211 Conn. 464, 470, 559 A.2d 1120 (1989); see, e.g., *Vollemans* v. *Wallingford*, 103 Conn. App. 188, 199, 928 A.2d 586 (2007) (''while often a source of great assistance and persuasive force . . . it is axiomatic that decisions of the United States Supreme Court are not binding on Connecticut courts tasked with interpreting [the] General Statutes'' (citation omitted; internal quotation marks omitted)), aff'd, 289 Conn. 57, 956 A.2d 579 (2008). This court should, of course, rely on persuasive federal precedent, particularly when the federal interpretation supports an expansive reading of the state act. When the federal interpretation is narrow or restrictive, however, this court must remember that ''we have interpreted our statutes even more broadly than their federal counterparts, to provide *greater* protections to our citizens, especially in the area of civil rights.'' (Emphasis in original.) *Commission on Human Rights & Opportunities* v. *Savin Rock Condominium Assn.*, *Inc.*, 273 Conn. 373, 386 n.11, 870 A.2d 457 (2005).

Like many standards in employment law developed by the United States Supreme Court, the definition of the term ''supervisor'' is not found in the statutory text of Title VII and was judicially articulated based on public policy considerations. See, e.g., *Faragher* v. *Boca Raton*, supra, 524 U.S. 804–805, 807–808 (*Ellerth/Faragher* affirmative defense was created by United States Supreme Court as result of policy considerations and has no express textual support in Title VII); *Meritor Savings Bank, FSB* v. *Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) (requirement that harass-

can be a guide but should not be a command, as we must remember that ''Connecticut is the final arbiter of its own laws.'' *Johnson* v. *Manson*, 196 Conn. 309, 319, 493 A.2d 846 (1985), cert. denied, 474 U.S. 1063, 106 S. Ct. 813, 88 L. Ed. 2d 787 (1986).

O'Reggio *v.* Commission on Human Rights & Opportunities

ment "be sufficiently severe or pervasive" as to amount to actionable discrimination is standard created by United States Supreme Court); see also *Haskenhoff* v. *Homeland Energy Solutions*, *LLC*, 897 N.W.2d 553, 611–12 (Iowa 2017) (Appel, J., concurring in part and dissenting in part) (citing cases). In these cases, and in *Vance*, "the federal courts have imposed an analytical structure [on] statutes that is not directly drawn from the federal statutes." S. Sperino, "Revitalizing State Employment Discrimination Law," 20 Geo. Mason L. Rev. 545, 574 (2013). Therefore, as one scholar rightly noted, "there is greater reason to be skeptical about importing these concepts into state law." Id., 573. I am indeed skeptical about importing the narrow *Vance* definition into our state law because "it fails to effectuate both the legislative policy underlying the [state act] and the remedial nature thereof . . . ." *Vollemans* v. *Wallingford*, supra, 103 Conn. App. 200 n.10. Instead, *Vance* "forces the realities of the workplace into an [ill fitted] set of descriptions, definitions, and standards"; L. Davenport, Comment, "*Vance v. Ball State University* and the Ill-Fitted Supervisor/Co-Worker Dichotomy of Employer Liability," 52 Hous. L. Rev. 1431, 1433 (2015); see id., 1461; and "will [therefore] hinder efforts to stamp out discrimination in the workplace." *Vance* v. *Ball State University*, supra, 570 U.S. 468 (Ginsburg, J., dissenting).

My conclusion that the definition of supervisor should include both an individual authorized to undertake or recommend tangible employment decisions and one with authority to direct the employee's daily work activities also finds support in a decision from New Jersey, *Aguas* v. *State*, 220 N.J. 494, 528, 107 A.3d 1250 (2015), in which the New Jersey Supreme Court rejected the narrow *Vance* definition of supervisor in favor of the more expansive definition adopted by the EEOC. In *Aguas*, the plaintiff correction officer claimed that

O'Reggio *v.* Commission on Human Rights & Opportunities

two of her supervisors subjected her to sexual harassment in the workplace and sought to impute liability to their employer. See id., 499, 505–506. Because the term supervisor was not defined by New Jersey's antidiscrimination law or in its case law, the court considered both the EEOC and *Vance* definitions of the term. See id., 526–28. In declining "to adopt the restrictive definition of 'supervisor' prescribed by the [United States] Supreme Court majority in *Vance*," the New Jersey court concluded, among other things, that "[t]he EEOC definition takes into account the broad range of employer structures and factual settings in which . . . harassment occurs." Id., 528. Additionally, the court determined that "the more expansive definition of 'supervisor' furthers the paramount goal of the [New Jersey antidiscrimination law]: the eradication of sexual harassment in the workplace. It prompts employers to focus attention not only on an elite group of [decision makers] at the pinnacle of the organization, but on all employees granted the authority to direct the day-to-day responsibilities of subordinates, and to ensure that those employees are carefully selected and thoroughly trained." Id. In my view, a more expansive definition of "supervisor" would have the same salutary effects for employers and employees in Connecticut.

In sum, I conclude that the Appellate Court incorrectly applied the *Vance* definition of the term "supervisor" in determining whether the department employer, the state Department of Labor, was vicariously liable under the *Ellerth/Faragher* framework. Instead, for purposes of the state act, I would define a supervisor as an employee empowered by the employer (1) to undertake or recommend tangible employment decisions affecting the employee, or (2) to direct the employee's daily work activities. I therefore respectfully disagree with the majority's failure to consider that "[a] supervisor with authority to control subordinates' daily work

is no less aided in his harassment than is a supervisor with authority to fire, demote, or transfer." *Vance* v. *Ball State University*, supra, 570 U.S. 457–58 (Ginsburg, J., dissenting).

Because I would reverse the judgment of the Appellate Court, I respectfully dissent.

———————————